2025 IL App (2d) 250319-U
No. 2-25-0319
Order filed November 17, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF RANDY GROH, | ) ) ) | Appeal from the Circuit Court of De Kalb County. |
| Petitioner-Appellant, | ) ) | |
| and | ) ) | No. 24-DN-98 |
| LISA GROH, | ) ) ) | Honorable Sarah Gallagher Chami, |
| Respondent-Appellee. | ) | Judge, Presiding. |

PRESIDING JUSTICE KENNEDY delivered the judgment of the court.
Justices McLaren and Schostok concurred in the judgment.

**ORDER**

¶ 1   *Held*: In pending divorce proceedings, the trial court entered an order prohibiting the parties from removing property from the marital residence. After removing property in violation of the order, the husband was found in indirect civil contempt of court. When the husband failed to return the items to satisfy the purge of contempt, the court ordered exclusive possession of the marital residence to the wife, from which order the husband appeals. We affirm.

¶ 2   In this divorce case, petitioner Randy Groh appeals the July 9, 2025, order granting exclusive possession of the marital residence to respondent Lisa Groh. The trial court previously had found Randy in indirect civil contempt of court because he had removed property from the marital residence in violation of a December 3, 2024, agreed order enjoining the parties from

removing, concealing, or disposing of any property from the marital home. Randy failed to return the items he removed from the marital home to purge the contempt finding, resulting in the court's sanction awarding possession of the marital home to Lisa. For the following reasons, we affirm.

¶ 3                                   I. BACKGROUND

¶ 4      We provide a more thorough recitation of the events preceding this appeal for contextual purposes than what Randy provided in his brief and in the record.[1] Randy and Lisa were married on September 14, 1996, and have three adult children, On November 6, 2024, Randy filed a petition for dissolution of marriage.

¶ 5      The De Kalb County Circuit Court's electronic docket reflects that on November 14, 2024, Randy filed a petition for temporary relief, although the docket does not make clear what relief Randy was requesting. Lisa filed a counterpetition for dissolution of marriage under a different case number (No. 24-DN-104 (Cir. Ct. De Kalb County)) the following day. On November 22, 2024, Lisa filed a petition for a temporary restraining order (TRO) against Randy in cause No. 24-DN-98 (Cir. Ct. De Kalb County). None of these filings are included in the record on appeal.

¶ 6      On December 3, 2024, the parties entered into an agreed order stating that "[t]he parties shall be enjoined, and restrained from removing, concealing or disposing of any property at the marital home until further order of the Court." Lisa acknowledged that she had removed items from the marital home including titles to some of Randy's vehicles, some guns, and some

---

[1]We have supplemented petitioner's recitation with information from the electronic docket of the circuit court of De Kalb County, of which we may take judicial notice. See *TCF National Bank v. Richards*, 2016 IL App (1st) 152083, ¶ 50. See also 735 ILCS 5/8-1002 (West 2022) ("Upon the review by any court of appellate jurisdiction of a judgment or order of a circuit court the court of appellate jurisdiction shall take judicial notice of all matters of which the circuit court was required to take judicial notice.").

ammunition. Lisa alleged that Randy had also removed vehicle titles, guns, and ammunition from the marital residence. The parties were ordered to deliver the vehicle titles to each of their attorneys within 48 hours of entry of the agreed order. Further, the order stated that "[a]ny violation of this agreed order shall be a basis to file a motion by either party." Finally, the trial court consolidated cause Nos. 24-DN-104 with 24-DN-98.

¶ 7 The electronic docket next reflects that Lisa filed a petition for rule to show cause on February 5, 2025. The following day, the trial court entered an order granting Lisa's petition and set a hearing for status on property appraisals and vehicle sales. Neither the petition nor the order was included in the record on appeal.

¶ 8 On February 25, 2025, Lisa filed a petition for TRO and injunction against Randy, who filed his response to Lisa's petition on March 20, 2025. Also on March 20, Randy filed a "petition to maintain status quo." None of these filings were included in the appellate record.

¶ 9 The trial court entered two orders on April 3, 2025, and April 10, 2025, regarding auctioneers for firearms and vehicles, which are not included in the record.

¶ 10 On April 21, 2025, Lisa filed another petition for rule to show cause, alleging that on April 11, 2025, Randy had removed from the marital home "one of the 1959 Cadillacs, the 1955 Chevy and a motor and transmission that were also on the trailer." Lisa further alleged that on April 19, 2025, she discovered that a 1966 Ford Mustang was missing from the marital property. Finally, she claimed that on April 20, 2025, she "observed Randy leaving the property with another vehicle on the trailer." Lisa argued that she attempted to resolve the issues by direct communication with Randy's counsel, but Randy continued to violate the court's December 3, 2024, order. She requested that her petition be entered and that Randy be found in indirect civil contempt of court.

She also requested, among other things, an order requiring Randy to purge himself of the contempt and return all property he removed from the marital residence.

¶ 11    The trial court heard argument on Lisa's petition on April 29, 2025. Lisa's counsel stated that Lisa already had "a TRO on file that says neither party can remove stuff from the property, but within two days of entering an order that we would contact the auction house to get things auctioned, [Randy] started removing things from the property." Randy responded that "the vehicles that were removed were just a few of them, and the reason they were removed is because they are not owned by either party. They are owned by separate parties." Randy also contended that he was receiving notices and fines from the County of De Kalb for storing the vehicles on his property, "and the only reason De Kalb is privy of this information is because [Lisa] is the one who told on him." Randy requested time to respond to the petition and stated that the parties met with the auctioneering company.

¶ 12    The trial court stated that, because the December 3, 2024, order prohibited the parties from removing property, Randy was required to file a motion to modify that order before removing any property from the marital residence. The court continued that it had "a significant issue with any lack of cooperation or following my order." The court admonished the parties to follow its orders and granted Randy seven days to respond to Lisa's petition. The court reminded Randy that "the TRO is in effect, so the request that the property should go back to the residence seems reasonable" and that the property "should not be disposed of in any way, shape or form." Finally, the court stated, "[n]o further property should be removed from the residence pursuant to my order."

¶ 13    After the hearing, the trial court entered an order granting Randy seven days to respond to Lisa's petition for rule to show cause. The order also stated, "[n]o further property will be removed

from the property on which the [m]arital residence is located and no property will be disposed of in any way. The Rule shall issue instanter by separate order."

¶ 14    On May 22, 2025, the trial court conducted a hearing on Lisa's petition for rule to show cause. Lisa testified that she was residing at the marital home and that "Randy is sometimes there," but "[m]ost nights he's not there." Their son also was residing at the marital home. The parties built the home in 2013 and resided there since, acquiring multiple vehicles, carts, and boats that were stored on the property. Lisa described that the marital residence includes "20 different either shipping or box-type containers," "a big pole barn," "a three-car garage" that is attached to the home, and "a ten-car underground garage." She stated that the property contains "a lot of storage area[s] and they're full." Lisa had access to most of these areas, but not all.

¶ 15    Lisa testified regarding the 1959 Cadillac, 1955 Chevy, and 1966 Ford Mustang that had previously been parked on the marital property but had since been removed. In addition, she described how, on April 20, 2025, she observed Randy leave the marital property with a white, "2000-ish" Corvette on a trailer. She stated that, to her knowledge, she and Randy owned those vehicles together. Lisa was unaware of any other ownership of those vehicles. She did not know who had possession of the titles to those vehicles.

¶ 16    Following Lisa's testimony, she moved the trial court to make a finding that she met a *prima facie* case for contempt against Randy. The court agreed that Lisa made a *prima facie* case for the finding of indirect civil contempt and that the burden shifted to Randy to show why he should not be held in indirect civil contempt.

¶ 17    Next, Randy testified on direct examination that he resides at the marital home with his wife and son, and described himself as a car collector. He stated that the marital property consists of 41 acres, including a large house. Randy acknowledged that an agreed order had been entered

on December 3, 2024, which provided that the parties were prohibited from removing property from the marital residence. Randy stated that he thought the order referred to "property that I own that is on the property." He did not believe the prohibition in the agreed order included "[v]ehicles that are stored [on the marital property] that are not of my ownership or Lisa's ownership." Randy stated that he commonly stored vehicles on his property that neither he nor Lisa owned. He explained that he stored other people's vehicles on his property "[f]or income and for helping friends who don't have storage places." He also had stored certain car titles at his home for cars that belonged to other people. He stated that Lisa had rummaged through his office and taken the car titles. Lisa had provided a copy of 80 car titles to her attorney, about half of which were not in the parties' names.

¶ 18    Randy testified that Garrett Baker, a fellow car collector, owns the 1959 Cadillac that he had removed from the marital property. Randy explained that he had "done a lot of work transporting cars, picking up cars, and buying and selling cars" with Baker. Randy stated that Baker had paid him to pick up the car from Mundelein and move it from that storage area because Baker had lost storage. Randy had offered to store the car on his property.

¶ 19    Randy also described how an auctioneer had met with the parties at their home to discuss the sale of the vehicles on the marital property. Randy had told the auctioneer that certain vehicles on the property did not belong to him and could not be auctioned. He was afraid that some of the vehicles that did not belong to him would be auctioned, so he started to remove them from the marital residence.

¶ 20    Randy admitted that he drove the 1959 Cadillac off the marital property to Baker. Randy stated that Baker also owned the 1955 Chevy. He sold the 1955 Chevy to Baker but could not remember when he did so and did not have a copy of the title. Randy submitted exhibit 4, a bill of

sale for the 1955 Chevy, that reflected he sold the car to Baker on August 26, 2023. Randy stated that he observed Baker sign the bill of sale.

¶ 21 Randy further testified that neither he nor Lisa owned the 1966 Ford Mustang. He stated that Robert Romanowski, a fellow car collector, owns the Mustang. Randy submitted as another exhibit a bill of sale for the Mustang, which reflected that he sold the car to Romanowski on November 16, 2023. Randy explained that the Mustang was parked at his marital residence because Romanowski did not have storage space. Randy "needed the money so [he] sold the car to Robert but [he] told him [he] would store it for free." Randy admitted that he removed the Mustang from his marital property. Randy had told the auctioneer that neither he nor Lisa owned the Mustang.

¶ 22 Next, Randy stated that Lisa had taken a video of him while he was removing a "2000s Corvette attached to a trailer." According to Randy, his cousin, Bobby Blendow, had bought the new Corvette in 2004. Randy stated that the Corvette was parked on his property because "it has a bad transmission," and he told Blendow that he would fix the car.

¶ 23 Finally, Randy testified that he had received a letter from the County of De Kalb in November 2024 stating that he was committing a zoning violation due to excess number of vehicles and parts and that he "was forced to clean up the property." Randy stated that Lisa had notified the county of the violations. Randy explained that he removed the vehicles because he was "in violation of county code law," and was told that the property needed to be cleaned up or otherwise he would be charged $500 per day for the violations. Randy stated that he believed that the December 3, 2024, order referred only to marital property but now understood that the order referred to any property located at the marital residence.

¶ 24    On cross-examination, Randy testified that some of the vehicles at the marital residence have no titles. Randy acknowledged that he owned those vehicles. Randy explained that the 1959 Cadillac did not have a title when it was sold to Baker because "[i]t's a race car." Lisa's counsel asked Randy, "the only thing you have that shows that you sold that vehicle to Mr. Baker is that handwritten note that's undated?" Randy responded that he had a handwritten bill of sale, "which is a legal document for transfer of vehicle ownership. That's the same thing that I used when I purchased the vehicle from its owner."

¶ 25    Randy transported the 1959 Cadillac to Baker's storage facility in Arlington Heights. After Randy was asked why the Cadillac was being stored at his property if Baker had a storage facility in Arlington Heights, Randy responded, "[b]ecause he just got the storage facility." Randy stated that whether he charged Baker for storing the Cadillac at his property depended on whether Randy "was short on money." Randy stored the Cadillac at the marital residence "as a favor because we were business associates and we bought and sold a lot of cars together." Randy acknowledged that he had three 1959 Cadillacs on his marital property.

¶ 26    Randy also acknowledged that he gave the handwritten note reflecting a bill of sale of the 1966 Ford Mustang to his counsel that morning because he could not find it earlier. Randy testified that the handwritten note was written on the date of sale and was not created after the fact for the purposes of the hearing on Lisa's petition for rule to show cause. Randy had told the auctioneer that he did not own the Mustang.

¶ 27    Next, Randy testified that he stored the Corvette at the marital residence without charging a fee to Blendow. When Lisa's counsel asked Randy for a copy of the title, Randy responded that the title was in Blendow's name and then stated, "Why would I [bring a copy of the title]? It's not my car." Randy's counsel stated that Randy "wouldn't even know to bring a potential title if they

didn't identify the car in their petition" and that Randy was not on notice of that. The trial court overruled Randy's objection, stating that he had notice that a vehicle was taken off the property on April 20, 2025. The court continued, "[w]hether or not that title needs to be produced is a separate issue, but I am going to say that he did have notice since he admits that he took that vehicle from the property on that specific date."

¶ 28     Lisa's counsel then asked questions regarding Randy's experience as a deputy sheriff for the Du Page County Sheriff's Police. Randy testified that during his career as a deputy sheriff, he was required to enforce court orders. Randy read the court orders he was asked to enforce to determine whether or not the orders were enforceable. Randy stated that "[t]he language of any court order has a certain level of interpretation." Lisa's counsel then asked, "when you were a police officer and you went out to the house, you allowed people to just interpret it however they wanted and didn't make arrests?" Randy responded, "I never said that." Randy acknowledged that the language of a court order matters and has importance in a case. He also acknowledged that the trial court in this case had entered an order on December 3, 2024, that he had agreed to follow, but understood it to mean that he was prohibited from removing marital property.

¶ 29     Following the parties' arguments on Lisa's petition, the trial court found Randy in indirect civil contempt of court, stating that Randy "felt justified in taking the actions of removing the property in absolute contradiction of my court order," and that his reason for doing so was simply a "self-serving justification." The court stated that based on Randy's prior employment, "he is learned sufficient to understand what a court order," namely "what 'any property' meant, and any property is any property. That would be cars. That would be guns. That would be paperwork." The court ordered the return of the vehicles to purge contempt. The court stated, "I understand the difficulties that that may pose for Mr. Groh, but again, this is a problem that he created, not this

Court and not Ms. Groh." The court ordered the vehicles to be returned within two weeks and if the order is not followed, "the Court will address any additional purge, which can be a monetary sanction, which could be time in the county jail." The court reiterated that the parties were prohibited from removing any property from the marital residence. The court stated that its orders are not subject to interpretation and are to be taken "with the utmost seriousness, and I expect that they will be followed."

¶ 30    The trial court entered an order on May 22, 2025, finding Randy in indirect civil contempt of court and ordering the 1959 Cadillac, 1955 Chevy, 1966 Ford Mustang, and the white Corvette to be returned to the marital residence within two weeks.

¶ 31    On June 3, 2025, the trial court entered an order granting Randy's counsel's motion for leave to withdraw. New counsel for Randy filed an appearance on June 4, 2025. Also on June 4, Randy filed a financial affidavit that stated he affirmed the information detailed within and all attached statements were true and correct as of January 15, 2025. The affidavit included two attached handwritten notes listing a total of 47 vehicles and boats. The electronic docket reflects that Randy filed an inventory of guns and ammunition in his possession, along with a copy of the car titles in his possession. These inventoried lists are not in the appellate record.

¶ 32    On June 5, 2025, the parties appeared for a status hearing on marital settlement. In a written order on the same date, the trial court stated that Randy's contempt was not purged. The order also stated that "both Kane County parcels of real estate shall be listed for sale."

¶ 33    On June 23, 2025, Randy filed an *ex parte* emergency petition for order of protection against Lisa (No. 25-OP-345 (Cir. Ct. De Kalb County)). The petition noted the pending divorce case between the parties. Randy alleged that on June 22, 2025, he was moving a trailer out of his pole barn. Lisa confronted him by using her car to block his exit. Lisa exited her vehicle and

recorded Randy by video, claiming that he was stealing property from the marital residence. When Randy attempted to enter Lisa's vehicle to move it out of the way, she ran towards him and slammed the car door into him. When Randy tried to push back the door, she again slammed the door into Randy and smashed his hand. Lisa screamed at him to get out of the car. Randy was unable to start the car because Lisa had removed the key. He noticed a cut on the backside of his right arm and observed his left elbow beginning to swell up from being struck by the car's doorframe. He called 911 and the De Kalb County Sheriff's Police arrived shortly thereafter. Lisa was arrested and charged with domestic battery (No. 25-DV-144 (Cir. Ct. De Kalb County)). He also claimed that on May 21, 2025, Lisa had confronted him in the basement of their house after he had locked himself inside a workshop. He stated that Lisa had broken the door handle and tried to force the door open. Lisa yelled at him to open the door and called him a coward and a loser for hiding inside the workshop. Randy alleged that Lisa had been very violent throughout their relationship and had become physically violent. He sought exclusive possession of the marital residence and that Lisa be ordered not to stay at the residence. He also sought the return of "all my firearms and ammunition and car titles."

¶ 34    On the same date, the trial court, with a different trial judge presiding than the judge who found Randy to be in indirect civil contempt, granted Randy's petition and entered an emergency order of protection against Lisa. The court granted Randy exclusive possession of the marital residence and Lisa was ordered not to stay at the residence. The order also stated that Lisa was required to return all of Randy's firearms, ammunition, and car titles to "50+ cars." The order noted that Lisa had not received notice of Randy's request for an order of protection.

¶ 35    Randy moved to consolidate the divorce case (No. 24-DN-98), with the case involving the order of protection (No. 25-OP-345). The trial court granted his motion and consolidated the two

cases on June 26, 2025. In addition, the court granted Randy an extension of the *ex parte* emergency order of protection to July 8, 2025.

¶ 36 The electronic docket reflects that on July 3, 2025, Lisa filed an *ex parte* emergency petition for order of protection (No. 25-OP-373 (Cir. Ct. De Kalb County)). Lisa's emergency petition for order of protection is not in the record on appeal.

¶ 37 Next, the electronic docket reflects that on July 7, 2025, Lisa filed a petition for TRO and a petition for rule to show cause, which included a motion for temporary exclusive possession of the marital residence because Randy failed to satisfy the purge. Neither of these petitions are included in the appellate record.

¶ 38 On July 8, 2025, the trial court entered an order of extension for the *ex parte* order of protection issued for Lisa on July 3 to July 9, 2025. That order also states, "[h]earing on temporary exclusive possession/contempt set for 1:30 p.m. on 7-9-25." The court consolidated Lisa's order of protection case with the divorce case on July 9, 2025. On the same date, the electronic docket reflects that Randy filed the following motions: (1) "motion for entry of order"; (2) "motion for modification of order"; (3) "motion for sale of marital residence"; and (4) "motion for inventory." In addition, Randy filed subpoenas seeking records from Baker and Blendow.

¶ 39 The next day, July 9, Randy filed a request for an emergency hearing and a petition for rule to show cause, neither of which are in the appellate record. The same day, the trial court conducted a hearing on the status of the purge of indirect civil contempt. Initially, Randy failed to appear at the hearing because, as his counsel explained, "the Court had stated that Mr. Groh was not to leave his property with anything, and the Court was excruciatingly clear about what anything meant." The court asked Randy's counsel whether an order of protection was in place that granted him exclusive possession of the property, to which she responded, "I don't know." Randy's counsel

further explained that Randy was not in court because "he can't leave the property with a car or clothing *** so he couldn't come here naked because that's illegal, and he would have no way of transporting himself here because that would also be illegal." The court stated that another person could have picked him up from the residence and driven him to court or the parties could have entered an agreement allowing certain property to leave the residence. Randy's counsel requested a continuance and objected "to the process by which this hearing is taking place. I do not accept notice of [Lisa's] motion for temporary exclusive possession. There was no notice of a purge, if that was what the hearing is for here today." The court again asked Randy's counsel whether she was requesting a continuance and counsel responded that she could not ask for a continuance and stated:

"If the only option is given to me, then over objection as to procedural process and the Court's excruciatingly clear statements that were made to this attorney about how the statements made were neither made in sarcasm, your facetiousism [*sic*] but where could be interpreted by this attorney in the ultimate strictest, most literal sense of English language this attorney took, the only action would be viewed as respectful to this Court given this Court's direction.

If the only option given to me under those circumstances is to ask for a continuance, then over objection of myself and without waiving same I must ask for a continuance."

¶ 40 The trial court asked Randy's counsel to clarify whether she was objecting to her own request for a continuance. Randy's counsel responded, "yes." Lisa stated that she filed additional petitions for exclusive possession (which are not included in the appellate record). She also stated that she would have agreed that Randy could appear in court at the hearing wearing clothes and

driving his own vehicle off the marital property. Lisa argued that Randy's actions amounted to nothing more than a "stall tactic" to remain on the marital property. Lisa expressed concern that he was removing additional property while she was in court and he remained at home.

¶ 41 The trial court reiterated that Randy had notice of the purge since the entry of the May 22, 2025, order. The court stated, "as a potential sanction which was discussed in pretrial conference, which I will now place on the record as is necessary, *** the request was made in pretrial conference for exclusive possession so that further property could not be taken from the home." Based upon the petitions for rule to show cause, "now procedurally we would not be able to proceed to hearing on those matters today." The court then asked for a brief pretrial conference in chambers.

¶ 42 Upon return, the trial court stated that the parties had engaged in a pretrial conference "prior to proceeding today for the entry or sentencing on the previously set purge." Randy's counsel again challenged whether the proceeding could move forward, and the court stated, "[a]s I sit here today it has been informed of the Court that those [four vehicles listed in the May 22, 2025, order] have not been returned to the marital property." Randy's counsel acknowledged that the vehicles had not been returned to the marital residence. The court also confirmed that Randy was getting dressed and driving to court "as expeditiously as possible."

¶ 43 Next, Randy's counsel called Baker, whom Randy had earlier subpoenaed, to testify via Zoom and, immediately thereafter, objected to appearance of the witness testifying by Zoom, stating, "I think that it does not provide the Court with the proper opportunity to judge the credibility of the witness." The trial court overruled the objection. Baker apparently was unable to start the video and unmute himself. While addressing those technical difficulties, the court asked for the next witness to testify.

¶ 44    Blendow testified via Zoom from a construction site while caulking a shower door. The trial court overruled Randy's objection to the appearance of Blendow by Zoom.

¶ 45    Blendow testified on direct examination that he was the owner of a 2006 white Corvette and that Randy is his cousin. Blendow stated that the Corvette currently was parked at his house for about one month. Randy was supposed to have replaced the transmission on the Corvette. The Corvette previously had been parked at Randy's house for about a year and a half. Blendow was aware of the court order requiring Randy to return the Corvette to the marital property. Blendow stated that he refused to return the Corvette to Randy because "[i]t's my Corvette. Why would I return it?" He was aware of the consequences his cousin would face if the Corvette was not returned.

¶ 46    On cross-examination, Blendow testified that Randy returned the Corvette when "he told me he couldn't figure out how to fix it, I said I've got somebody else that can do it, please bring it back." Randy had not told Blendow that there was a court order to sell the vehicles parked on his property. Blendow added, "that was pre all of this, I believe." Blendow continued, "I believe that was before all of this was taking place that he brought my car back, and after he told me all of this I consulted with my lawyer, and my lawyer said *** don't let them take the car back." Blendow claimed that he had title to the Corvette and that Randy had never asked him for a copy of the title. He never made an agreement with Randy to give him or sell him the Corvette. When Lisa's counsel asked whether Blendow would return the Corvette if Randy called him from jail, Blendow responded that he "would have to get my lawyer involved in it then because my lawyer is giving me all sorts of different information on this on why I should not give this." He then stated that he would not return the vehicle to Randy's marital residence. He also stated that he did not pay Randy to fix the transmission of the Corvette and that Randy was fixing it for free.

¶ 47    Next, the trial court asked Randy's counsel whether any of the other witnesses would be testifying. Neither of the remaining witnesses appeared. Randy's counsel stated that she had the titles to the vehicles owned by Baker, "but without him here I don't believe they're self-authenticating so no."

¶ 48    Lisa testified that none of the four vehicles listed in the May 22, 2025, court order were returned to the residence.

¶ 49    After finally arriving to court, Randy testified on direct examination that he had been storing the vehicles listed in the May 22, 2025, court order for his friends and that he did not return them to the marital property. Randy stated that the owners of those vehicles refused to allow him to return them to the marital property. He did not receive money to store the vehicles on his property. Randy also stated that he removed two trailers from the marital residence since the entry of the May 22 order, but he returned them. He used the trailers to remove mulch bags that were left on the marital property but returned the mulch bags to the property as well. Randy explained that he was assisting a friend to move contents of a store that was closing. He stated that the move took weeks to complete. When he drove the trailers off the property, he also took some small hand tools, an air pump, and an English wheel, a tool for forming sheet metal. He denied that he disposed of any additional marital property. Randy stated that if he could not reside at the marital home, he had no other place to stay. He stated that he was not on speaking terms with his daughter and could not stay in the coach house. His monthly pension payment totaled $9,600 per month.

¶ 50    On cross-examination, Randy testified that he does not sleep at the marital residence every night and could not provide a percentage for how often he sleeps at home. Randy acknowledged that he owns a house in St. Charles that he was trying to lease to another renter after a squatter had left the premises. Randy also acknowledged that in the inventory of cars listed in his financial

affidavit, which Lisa submitted as exhibit 2, there were notations next to the listing of a 1955 Chevy and 1959 Cadillac with the word, "keep," next to them. In addition, Randy stated that he was aware that his father-in-law recorded a video of him driving the flatbed trailer, but Randy denied that he was removing the trailer from his property. Randy then acknowledged that he and Romanowski were driving near the intersection of Perry Road and Hinckley Road with the loaded trailer, approximately two miles from the marital residence.

¶ 51 On redirect examination, Randy testified that he and his son created the list of cars years before the divorce. He stated that trading and moving cars is his passion. He stated that he sold the 1955 Chevy but could not recall the date of sale. He claimed that he sold it before the divorce.

¶ 52 After the parties' argument, the trial court made its findings as follows. The court stated that Randy had testified that he removed the cars from the property "in contradiction to this Court's orders. He made no efforts to address this Court for this removal by motion or otherwise." The court found Randy's testimony to be self-serving and calculated. The court noted that it had previously admonished the parties not to remove property "and if that occurred there would be additional sanctions. Property was removed." The court granted exclusive possession of the marital home to Lisa to prevent the removal of any further property from the marital residence. The court stated that it had taken into consideration the hardships that may exist due to its decision. The court noted that the parties own two rental properties in St. Charles, one of which remains unrented, in which Randy could reside. The court ordered the four vehicles to be returned to the marital residence. It acknowledged Randy's defense of impossibility, though it did not find Randy's ability to return the vehicles impossible after considering the testimony. Exclusive possession of the marital residence to Lisa was granted until further order of the court.

¶ 53    After the hearing, the trial court entered an order granting exclusive possession of the marital residence to Lisa. In a separate order, the court stated, "exclusive possession to remedy 10 is vacated," in reference to the court's June 23, 2025, order granting Randy possession of specific personal property at the marital residence. The court also granted an extension of Lisa's *ex parte* emergency order of protection to July 31, 2025.

¶ 54    The electronic docket reflects that on July 15, 2025, the trial court entered another order granting Lisa exclusive possession of the marital home and finding that Randy had not purged contempt. This order is not included in the record on appeal, however, on the order of this court, we *sua sponte* obtained a copy of it from the circuit court clerk's office of De Kalb County and take judicial notice of said order. *NBD Highland Park Bank, N.A. v. Wien*, 251 Ill. App. 3d 512, 520-21 (1993) (noting that public documents, including court records, are subject to judicial notice); see also *In re Marriage of Wojcik*, 362 Ill. App. 3d 144, 169 (2005) (same).

¶ 55    On July 30, 2025, Randy filed a notice of interlocutory appeal challenging the order filed on July 9, 2025, "granting [Lisa] exclusive possession of the parties' marital residence."

¶ 56                                    II. ANALYSIS

¶ 57    Randy argues on appeal that the trial court erred when it granted Lisa exclusive possession of the parties' marital residence. Randy contends that the court "did not receive or consider any evidence that [Lisa] would suffer jeopardy to her physical or mental well-being absent an award of exclusive possession" pursuant to section 501(c-2) of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/501(c-2) (West 2022)). He also asserts that the court failed to make explicit statutory findings under section 214(c)(1), (2), and (3) of the Domestic Violence Act of 1986 (750 ILCS 60/214(c)(1)-(3) (West 2022)). Finally, Randy contends that the court's July 9, 2025, order is invalid because it lacks a purge provision, specifically, "[t]he grant of exclusive

possession of the parties' marital residence to [Lisa] did not purge [Randy's] civil contempt, and, [Randy's] actual purge (return of four vehicles) would not eliminate the award of exclusive possession to [Lisa]."

¶ 58                                          A. Jurisdiction

¶ 59     Before we address the merits of Randy's appeal, we have an independent duty to consider whether we have jurisdiction. See *R.W. Dunteman Co. v. C/G Enterprises, Inc.*, 181 Ill. 2d 153, 159 (1998). This duty is present even when a party has not contested the court's jurisdiction to review the matter. *Secura Insurance Co. v. Illinois Farmers Insurance Co.*, 232 Ill. 2d 209, 213 (2009). When jurisdiction is found to be lacking, the reviewing court must dismiss the appeal. *Tunca v. Painter*, 2012 IL App (1st) 093384, ¶ 22.

¶ 60     In this case, Randy filed an appeal under Supreme Court Rule 307(a)(1) (eff. Nov. 1, 2017), which allows interlocutory appeals as of right from an order of court "granting, modifying, refusing, dissolving, or refusing to dissolve or modify an injunction." He specifically challenges the trial court order entered on July 9, 2025, awarding Lisa exclusive possession of the marital residence as a sanction after he failed to purge the finding of indirect civil contempt from May 22, 2025.

¶ 61     Supreme Court Rule 304(a) allows for appeals from final judgments that resolve one, but fewer than all, of a party's claims, so long as the trial court "has made an express finding that there is no just reason for delaying either enforcement or appeal or both." Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016). In contrast, Supreme Court Rule 304(b) allows for immediate interlocutory appeals of specific types of judgments without a special finding under Rule 304(a). Pertinent here, Rule 304(b)(5) (eff. Mar. 8, 2016) provides that "[a]n order finding a person or entity in contempt of court which imposes a monetary or other penalty" is appealable as a final, appealable order. *In re*

*Marriage of Gutman*, 232 Ill. 2d 145, 153 (2008). Our supreme court explained that, because the subject of a contempt judgment may face incarceration or forfeiture of property, Rule 304(b)(5) allows the contemnor to seek immediate review of the finding and sanction imposed. *Id*. Accordingly, as the trial court found Randy in indirect civil contempt and imposed the sanction of exclusive possession of the marital residence to Lisa, we have jurisdiction to review Randy's interlocutory appeal pursuant to Rule 304(b)(5) in addition to Rule 307(a)(1).

¶ 62                                B. The "Record" on Appeal

¶ 63    Regardless of which supreme court rule we apply from a jurisdictional standpoint, Randy failed to comply with either of the rules in preparing and submitting the record on appeal. Ill. S. Ct. R. 321 (eff. Oct. 1, 2021); Ill. S. Ct. R. 328 (eff. July 1, 2017). In this case, Randy filed a "Supporting Record" under Rule 328, which requires the appellant to contain "enough of the trial record *to show an appealable order or judgment*, a timely filed and served notice of appeal[,] and any other matter necessary to the application made. (Emphasis added.) Ill. S. Ct. R. 328 (eff. July 1, 2017). This court resorted to taking notice of De Kalb County's electronic court docket to fill in the missing pieces from the record. Most conspicuously, the record did not include the trial court's July 15, 2025, order, which we obtained *sua sponte* and of which we took judicial notice. The July 15, 2025, order found that Randy failed to purge contempt, granted Lisa exclusive possession of the marital residence, and stated that Lisa was granted exclusive possession "until such time as Randy Groh has returned the 4 vehicles listed in the May 22, 2025 order." Including the July 15, 2025, order in the record before us was imperative considering that Randy argues on appeal that the trial court failed to include a purge provision, pointing to the July 9, 2025, order instead, which lacked a purge provision. We view this as an improper attempt to cherry pick the record and highlight an order to this court that seemed favorable to Randy, in an effort to overturn the trial

court's findings. We admonish counsel for the appellant to comply with the rules of our supreme court and present the reviewing court with the appropriate documentation to consider the appeal. In addition, the record did not include Lisa's July 3, 2025, *ex parte* emergency petition for order of protection, and her July 7, 2025, petitions for TRO and rule to show cause, which included a motion for temporary exclusive possession of the marital residence. An appellant, in this case, Randy, has the burden of presenting a sufficiently complete record of the trial court proceedings to support any claims of error and, in the absence of such a record, this court will presume the trial court's orders conformed with the law and had a sufficient factual basis. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). Any doubts arising from an incomplete record will be resolved against the appellant. *Id*. Despite the "missing" information from the record, we have enough documentation to consider the merits of Randy's appeal.

¶ 64                                C. Contempt Sanction

¶ 65     The trial court in this case found Randy to be in indirect civil contempt. Contempt of court is defined as "conduct calculated to embarrass, hinder, or obstruct a court in its administration of justice or to derogate from its authority or dignity or bring the administration of law into disrepute." *In re Estate of Melody*, 42 Ill. 2d 451, 452 (1969). "Generally, civil contempt occurs when a party fails to do something ordered by the trial court, resulting in the loss of a benefit or advantage to the opposing party." *In re Marriage of Charous*, 368 Ill. App. 3d 99, 107 (2006). A contempt of court order is used as a means to control conduct either by punishing an offender who obstructs or embarrasses the court in its administration of justice or by coercing compliance with court orders. *People v. Budzynski*, 333 Ill. App. 3d 433, 438 (2002).

¶ 66     Contempt is characterized as either direct or indirect. Indirect contempt of court, which the trial court found in this case, refers to contumacious actions that occur outside of the courtroom.

*Charous*, 368 Ill. App. 3d at 107. The existence of a court order and proof of willful disobedience of that order are essential to any finding of indirect contempt. *In re Marriage of Tatham*, 293 Ill. App. 3d 471, 480 (1997). "The burden initially falls on the petitioner to prove by a preponderance of the evidence that the alleged contemnor has violated a court order." *Charous*, 368 Ill. App. 3d at 107. If a preponderance of the evidence is established, the burden then shifts to the alleged contemnor to show that noncompliance with the trial court's order was not willful or contumacious and that he had a valid excuse for failure to follow the court order. *Id*. at 107-08.

¶ 67    Civil contempt proceedings have two fundamental attributes: (1) the contemnor must be capable of taking the action sought to be coerced and (2) no further contempt sanctions are imposed upon the contemnor's compliance with the pertinent court order. *In re Marriage of Sharp*, 369 Ill. App. 3d 271, 279 (2006). "One of the chief characteristics of civil contempt is that the contemnor must 'hold the keys to the cell,' *i.e.*, he must have it within his power to purge himself by complying with the court's order." *Pancotto v. Mayes*, 304 Ill. App. 3d 108, 111 (1999) (citing *In re Marriage of Betts*, 200 Ill. App. 3d 26, 44 (1990)). "Contempt based on past actions which cannot be undone means that the contemnor lacks the ability to purge the contempt because the purpose of civil contempt is to compel compliance with court orders, not to punish." (Internal citations omitted.) *In re Marriage of O'Malley*, 2016 IL App (1st) 151118, ¶ 26. "Therefore, whenever a court order cannot be complied with, there cannot be a finding of civil contempt." *Id*. Whether a party is guilty of civil contempt is a question for the trial court and its decision will not be disturbed unless it is against the manifest weight of the evidence or the record demonstrates an abuse of discretion. *Charous*, 368 Ill. App. 3d at 108 (citing *In re Marriage of Logston*, 103 Ill. 2d 266, 286-87 (1984)); *cf. In re Marriage of Barile*, 385 Ill. App. 3d 752, 759 n. 3 (2008) (applying the *Logston* standard despite the supreme court's general advisement against application of the

abuse-of-discretion standard to findings of fact). "A decision is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based on any of the evidence." *In re Marriage of Demaret*, 2012 IL App (1st) 111916, ¶ 43. "A trial court abuses its discretion 'only where no reasonable person would take the view adopted by it.' " *In re Marriage of Lyman*, 2015 IL App (1st) 132832, ¶ 89 (quoting *Fremarek v. John Hancock Mutual Life Insurance Co.*, 272 Ill. App. 3d 1067, 1074 (1995)).

¶ 68    In this case, the trial court based its finding of indirect civil contempt on Randy's violation of the December 3, 2024, agreed court order prohibiting the parties from removing any property from the marital residence. At the hearing on Lisa's April 21, 2025, petition for rule to show cause, she testified that a 1959 Cadillac, 1955 Chevy, and a 1966 Ford Mustang had been removed from the marital residence. In addition, Lisa observed that, on April 20, 2025, Randy left the property with a white, "2000-ish" Corvette on a trailer. She testified that, to her knowledge, she and Randy owned those vehicles together. Thus, Lisa established a *prima facie* case for indirect contempt of court and the burden shifted to Randy to demonstrate that his removal of the vehicles in violation of the December 3, 2024, agreed court order was not willful or contumacious, but based upon a valid excuse. See *In re Marriage of Barile*, 385 Ill. App. 3d 752, 758-59 (2008); *Charous*, 368 Ill. App. 3d at 107-08.

¶ 69    After the trial court found that Lisa had established a *prima facie* case of indirect civil contempt, Randy acknowledged that the parties had entered into an agreed order on December 3, 2024, but stated he thought the order referred to "property that I own that is on the property." He also testified that the vehicles he removed from the marital residence were not owned by him or Lisa. However, on cross-examination, Randy stated that some of the vehicles at the marital

residence have no titles and he acknowledged that he owned those vehicles. He apparently produced handwritten bills of sale for the 1959 Cadillac, 1955 Chevy, and 1966 Ford Mustang, none of which are in the record on appeal. Further, when Lisa's counsel asked Randy for a copy of the title to the white Corvette, Randy responded that the title was in his cousin's name and stated, "Why would I [bring a copy of the title]? It's not my car." The record on appeal contains no documentary evidence of who owns the Corvette. Nevertheless, Randy had the burden to establish that his removal of the four vehicles from the marital property was not willful or contumacious but based upon a valid excuse. Instead, Randy acknowledged that he removed the vehicles from the property in violation of the agreed order and provided self-serving testimony to the trial court without appropriate documentation to support what he claimed to be a valid excuse. In short, Randy failed to demonstrate that his removal of the four vehicles from the property was not willful or contumacious.

¶ 70    Moreover, Randy continued to violate the trial court's orders after he failed to return the four vehicles to the marital residence within the two weeks provided by the May 22, 2025, order. A June 5, 2025, court order reflected Randy's failure to comply with the order to purge contempt. Despite continuing violations of court orders, on June 23, 2025, more than one month after he had been ordered by the trial court to return the four vehicles to the marital residence, Randy filed an *ex parte* emergency petition for order of protection against Lisa, seeking exclusive possession of the marital residence. Randy's petition was presented *ex parte* before a different trial judge than the judge presiding over the divorce proceedings. Although Randy's petition indicated that divorce proceedings were ongoing, the court granted his petition and awarded him exclusive possession of the marital residence. Lisa then filed a petition for rule to show cause on July 7, 2025, which included a motion for temporary exclusive possession of the marital residence because Randy still

had not satisfied the purge, as ordered by the trial court on May 22, 2025. During the July 9, 2025, hearing on the status of the purge, Randy attempted to delay the proceedings by claiming he was forbidden from leaving the marital residence and strenuously objecting to the proceedings. When he finally arrived to court, he testified that he had been storing the vehicles that were the subject of the May 22, 2025, court order and that the owners of those vehicles refused to allow him to return the vehicles to the marital residence.

¶ 71　We agree with the trial court that Randy made no effort whatsoever to address the court by motion or otherwise to seek permission to remove property from the marital residence after entry of the agreed order on December 3, 2024. Not only did Randy remove the four vehicles in violation of the December 3, 2024, agreed order, he failed to satisfy the May 22, 2025, court order to purge the finding of indirect civil contempt. He also failed to provide the trial court or this court with sufficient documentation to establish who owned the vehicles in question. Moreover, the record shows Randy blatantly continued to remove other property from the marital residence after he had been found in indirect civil contempt and after the court had subsequently specifically ordered the parties not to remove any additional property. Randy's removal of the four vehicles and removal of additional property from the marital residence in violation of the trial court's orders was willful and contumacious.

¶ 72　Based on the record before us, the manifest weight of the evidence supports the trial court's finding of indirect civil contempt against Randy and the sanction of awarding temporary exclusive possession of the marital residence to Lisa, particularly when considering that Randy continued to remove property from the marital residence repeatedly in violation of the court's orders. Furthermore, the trial court reasonably found that Randy's impossibility defense was not credible because he lacked supporting documentation and provided self-serving testimony. Finally, Randy

failed to establish a good faith attempt to purge himself of contempt, not only because he lacked supporting documentation, but also because he failed to demonstrate a good faith attempt to regain control of the vehicles and return them to the marital property or seek the return of the vehicles either through litigation or other action directed against the persons in possession of them. We find no abuse of discretion occurred.

¶ 73    We briefly address Randy's arguments that the award of temporary exclusive possession of the marital residence to Lisa was inappropriate under section 501(c-2) (750 ILCS 5/501(c-2) (West 2022)) of the Marriage and Dissolution of Marriage Act and section 214(c) (750 ILCS 60/214(c) (West 2022)) of the Domestic Violence Act of 1986. Section 501(c-2) of the Marriage and Dissolution of Marriage Act concerns allocation of use of the marital residence and requires on file "a verified complaint or verified petition seeking temporary eviction from the marital residence *** only in cases where the physical or mental well-being of either spouse or his children is jeopardized by occupancy of the marital residence by both spouses." 750 ILCS 5/501(c-2) (West 2022). Section 214(c) of the Domestic Violence Act requires the trial court to consider certain relevant factors when determining whether to grant a specific remedy, other than the payment of support, when considering "the nature, frequency, severity, pattern and consequences of the respondent's past abuse, neglect or exploitation of the petitioner or any family or household member," among other things. 750 ILCS 60/214(c) (West 2022). Section 214(b) of the Domestic Violence Act provides a remedy of exclusive possession of residence in cases involving orders of protection. 750 ILCS 60/214(b) (West 2022). If the trial court finds the petitioner has been abused, it can prohibit the respondent from entering and remaining in any residence, household, or premises of the petitioner. *Id*. However, these statutes are inapplicable here because this case involves a finding of indirect civil contempt and the imposition of a sanction for failure to satisfy

the purge of contempt. Indeed, Randy's notice of appeal challenges the July 9, 2025, order awarding exclusive possession of the marital residence to Lisa, which was based on his failure to purge indirect civil contempt. We reject his arguments on these bases.

¶ 74    Finally, Randy argues that the trial court's order entering indirect civil contempt was invalid because it lacked a purge provision, neglecting to mention to this court that the July 15, 2025 order does, in fact, include a purge provision. Nevertheless, beginning on May 22, 2025, the trial court, both in a verbal and written order, specifically ordered the four vehicles to be returned within two weeks and if the order was not followed, "the Court will address any additional purge, which could be a monetary sanction, which could be time in the county jail." The May 22, 2025, written order expressly provides, "Randy Groh is ordered to return the following vehicles to the marital residence property within 2 weeks [of] today's date," and then lists the four vehicles. The same order also states, "[a]ny other property removed from the premises after the entry of the December 3, 2024 Order shall also be returned to the property within 2 weeks [of] this order." Randy also conveniently failed to mention this order in his argument and simply jumped forward to the July 9, 2025, hearing when the trial court stated that "these four cars should be returned to the marital residence and the exclusive possession will remain until that time." Immediately prior to that ruling, the court also stated, "I do have to allow the keys to the cell door, though I presume Mr. Groh is happy that the cell door is not what we are working with today." In short, the court granted Lisa exclusive possession of the marital residence as a sanction because Randy kept removing property in violation of court orders when it could have ordered a jail sentence or monetary sanctions. Randy contends that the July 9, 2025, order granting exclusive possession of the marital residence to Lisa did not include a purge provision. This is a disingenuous argument considering the trial court's May 22, 2025, order specifically delineated what was required to purge

contempt and the June 5, 2025, order found that Randy had failed to purge. A purge provision also was specifically included in the trial court's July 15, 2025, order, which Randy failed to include in the record before us. We reject Randy's argument that the trial court failed to include a purge provision in its order and, in the event Randy has yet to satisfy the purge of indirect civil contempt, we warn him to follow the trial court's orders or potentially face further sanctions.

¶ 75    In this case, the parties entered into an agreed court order specifically prohibiting the removal of property from the marital residence and there is clear proof of willful disobedience of that order and orders entered thereafter. The record shows that Randy had no compelling justification for failing to comply with the trial court's orders or to satisfy the purge of indirect civil contempt. Randy's failure to comply with court orders impeded the divorce proceedings and, therefore, contempt of court rested on conduct constituting willful abuse of the legal process. Following court orders is not a suggestion. See *People v. Loughran*, 2 Ill. 2d 258, 262 (1954) ("All courts are vested with an inherent power to punish for contempt as an essential incident to the maintenance of their authority and the administration and execution of their judicial powers."). The manifest weight of the evidence supports the trial court's findings and we find no abuse of discretion.

¶ 76                               III. CONCLUSION

¶ 77    For the reasons stated, we affirm the judgment of the circuit court of De Kalb County.

¶ 78    Affirmed.